"UNDER SEAL"

FILED
CHARLOTTE, NC

FEB 21 2017

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:17cr_45_ — MOC |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| **(1) OLEG KORNIEV** | ) | Violations: |
| a/k/a "FairPlay" | ) | 18 U.S.C. § 2 |
| a/k/a "FP" | ) | 18 U.S.C. § 371 |
| a/k/a "Ocean" | ) | 18 U.S.C. § 1028A |
| a/k/a "Gold" | ) | 18 U.S.C. § 1029 |
| a/k/a "Platinumuran" | ) | 18 U.S.C. § 1030 |
| **(2) SERGHEI IVANOVICH TOMUZ** | ) | 18 U.S.C. § 1956 |
| a/k/a "Oskars" | ) | 18 U.S.C. § 2314 |
| | ) | 18 U.S.C. § 2315 |
| | ) | |
| | ) | **UNDER SEAL** |

## THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

### I. Introduction

1. From in or about September 2007 and continuing until in or about July 2014, an international money laundering organization, named Your Mule Cashout ("YMCO") by law enforcement, offered its Money Mule services to computer Hackers, ultimately laundering at least $10 million in stolen money from the United States overseas. Defendant OLEG KORNIEV was a principal of YMCO and a member during its entire existence, and defendant SERGHEI IVANOVICH TOMUZ was a conspirator from in or about May 2009 and continuing until at least in or about October 2010.

2. Defendant OLEG KORNIEV and others worked for YMCO primarily from Ukraine, but also possibly from Germany, Poland, and other places outside the United States. They created, maintained, and operated a sophisticated online infrastructure that allowed

computer Hackers, who had stolen money primarily from United States victims' bank accounts, to conceal, transfer, and obtain the stolen money in countries outside of the United States.

3. With the assistance of YMCO Money Mules, YMCO members and other computer Hackers electronically transferred millions in stolen money from U.S.-based compromised bank accounts to foreign countries, including Moldova, Ukraine, Russia, and Latvia.

## II. The Fraudulent Scheme

4. YMCO's services operated through an online infrastructure that allowed international cyber-criminals ("Hackers") to transfer stolen money out of the United States, primarily to Eastern Europe, in exchange for a percentage of the money stolen. YMCO marketed its services to these Hackers in underground chat forums.

5. These Hackers utilized various computer malware programs to infect the computers of United States victims. The malware programs enabled the Hackers to access the victims' bank accounts and then steal money from those accounts utilizing the services of YMCO.

6. YMCO provided these services to the Hackers through the use of Money Mules. Money Mules were U.S. residents whom YMCO deceived into believing that they were working for legitimate companies and conducting legitimate money transfers for those companies.

7. Through sophisticated computer programming, YMCO created seemingly legitimate websites for fake companies. YMCO members used these websites to recruit and employ Money Mules to conduct YMCO money laundering services. The websites, as well as the YMCO computer infrastructure, were created and maintained by "Programmers" and "Administrators," respectively.

8. After the creation of websites for the fake companies, YMCO "Recruiters" sent spam emails to potential Money Mules advertising employment opportunities. When a potential Money Mule responded to the spam, YMCO put the applicants through what appeared to be a legitimate hiring process, including an application, employment test, employment agreement, registration with the company's website, review of company policies, and assignment of a supervisor ("Handler"). YMCO Handlers were responsible for communicating directly with the Mules and assigning them money processing jobs. Handlers communicated with the Money Mules by email, telephone, and through a messaging platform built into the website of the fake company. Within YMCO, Recruiters and Handlers were supervised by "Managers," who reported directly to the YMCO principals.

9. As a condition of employment, YMCO required each Money Mule to have a U.S.-based bank account and to provide the organization with their account information using a website associated with the fake company. YMCO informed the new Money Mules that they would be working from home, processing payments for legitimate transactions. Specifically, YMCO falsely represented that the Mules' job was to receive payments from businesses into their personal bank accounts, withdraw the money, and then wire the funds to the fake company's partners overseas. In reality, the Money Mules processed the Hackers' stolen proceeds and wired them out of the country to other YMCO conspirators.

10. Once YMCO obtained the Money Mules' account information, the organization made that information available to the Hackers through an online portal. After a Hacker compromised a bank account, the Hacker used the YMCO platform to access the account information for a Money Mule. The Hacker then sent the stolen money to the Mules' bank accounts.

11. At or around the time the Hackers wired money from the compromised account, a Handler emailed the relevant Money Mule alerting him that he had a new task. This caused the Mule to then log into the fake company website, where a message awaited. This message instructed the Mule to withdraw the newly deposited funds from his account, take the funds to a money services company, and transfer the funds overseas. In most instances, YMCO directed the funds to be wired by Western Union or MoneyGram to Eastern Europe, usually to Moldova, Ukraine, Russia, or Latvia.

12. YMCO and the Hackers used each Money Mule only once and never paid the promised salary. Sometimes the Money Mules lost money on the transaction because of associated banking and transmitting fees.

13. YMCO contracted with individuals ("Cash-Out Contractors") in the foreign countries to retrieve the wired money. From in or about May 2009 and continuing until at least in or about October 2010, the Cash-Out Contractors operating out of Moldova accepted transfers from YMCO's U.S.-based Money Mules, took a percentage of the money transferred, and then delivered the remaining money to YMCO.

14. In Moldova, a conspirator provided the Cash-Out Contractors with the stolen personal information of adult Moldovan students. The Cash-Out Contractors provided these misappropriated identities to YMCO, who then provided them to Money Mules.

15. The Mules then sent the funds by Western Union or MoneyGram to the Cash-Out Contractors in Moldova under the names of the stolen Moldovan identities. YMCO then provided the Cash-Out Contractors with the unique transfer tracking number, associated (stolen) name, and transfer amount.

16. Members of the Cash-Out Contractors then provided the stolen names and unique transfer tracking numbers to bank tellers in Moldova who worked for the Cash-Out Contractors. The tellers surreptitiously accepted and held the funds, and then provided the funds to the Cash-Out Contractors. The Cash-Out Contractors then took a percentage of the funds for their fee before transferring the remaining proceeds to YMCO.

17. Although YMCO was the Moldovan Cash-Out Contractor's largest customer, they provided the same service to other cybercriminal organizations.

18. In addition to the United States, YMCO operated similar money laundering schemes in Germany, Italy, United Kingdom, and Australia, among other places.

## III. <u>Entities and Individuals</u>

19. *Defendants*. OLEG KORNIEV, among others known and unknown, was a member of YMCO, and SERGHEI IVANOVICH TOMUZ, among others known and unknown, was a Cash-Out Contractor:

a. The defendant, OLEG KORNIEV, was a Ukrainian national who was a resident of Ukraine. KORNIEV was a principal of YMCO and a member during its entire existence, from in or about September 2007 and continuing until in or about July 2014. As a principal, KORNIEV developed YMCO's policies and procedures; managed, hired, and fired employees; rewarded and punished employees based on performance; and secured illegal services supporting YMCO. To hide his true identity, KORNIEV used the monikers "FairPlay," "FP," "Ocean," and "Gold" while working for YMCO.

b. The defendant, SERGHEI IVANOVICH TOMUZ, was a Moldovan national who was a resident of Moldova. TOMUZ was a principal of the

Moldovan Cash-Out Contractors and laundered funds on behalf of YMCO from in or about May 2009 and continuing until at least in or about October 2010. In that role, TOMUZ oversaw day-to-day operations, negotiated fees, reconciled accounts, aggregated the laundered funds, and transferred the proceeds to the other criminal groups. To hide his true identity, TOMUZ used the moniker "Oskars" while conspiring with YMCO.

20. *Conspirators*. Victor Chostak, Oleksandr Kharchenko, Alexey Marchenko, and Oksana Rabutska (indicted elsewhere), among others known and unknown, were members of YMCO:

a. Chostak was a Ukrainian national who was at times a resident of Ukraine and the United States. Chostak was a YMCO Recruiter from at in or about July 2009 to in or about the summer of 2010. Chostak was a YMCO Mule Handler from in or about the summer of 2010 to in or about November 2010. Chostak was a YMCO manager from in or about November 2010 to in or about May 2014. As a Manager, Chostak recruited, hired, and managed the Money Mule Recruiters and Handlers. Specifically, Chostak assigned tasks to Recruiters and Handlers; provided domains for fake front company websites; provided facilities for communications, such as fax numbers, to Recruiters and Handlers to use with fake front companies; and worked with programmers to modify front company websites and various computer programs to meet the needs of Recruiters and Handlers. To hide

his true identity, Chostak used the monikers "Victorchik" and "Endless" while working for YMCO.

b. Kharchenko was a Ukrainian national who was at times a resident of Ukraine and the Netherlands. Kharchenko was a YMCO Programmer from at least September 2009 and continuing to a date uncertain, but at least through March 2011. As a Programmer, Kharchenko wrote computer programs that enabled YMCO conspirators to more effectively execute the scheme. To hide his true identity, Kharchenko used the moniker "Kharch" while working for YMCO.

c. Marchenko was a Ukrainian national who was a resident of Ukraine. Marchenko was a YMCO Administrator from at least September 2009, and continuing to a date uncertain, but at least through April 2011. As an Administrator, Marchenko maintained and improved the functionality of YMCO's computer infrastructure. Specifically, Marchenko prepared and configured central servers; updated servers hosting the fake front company websites; updated and improved computer code; backed up databases that stored data for numerous YMCO computer programs; and created and updated templates used to generate fake front companies. To hide his true identity, Marchenko used the monikers "Buddha" and "Gautama" while working for YMCO.

d. Rabutska was a Ukrainian national who was a resident of Ukraine. Rabutska was a YMCO Money Mule Recruiter from at least July 2009, and continuing to a date uncertain, but at least through May 2011. As a

Recruiter, Rabutska created and edited recruiting email templates; sent recruiting emails to prospective Money Mules; communicated with prospective Mules; reported problems to management such as broken domains and fax numbers; and suggested changes to tools and processes to improve the recruitment of Money Mules. Rabutska used her first name "Oksana" as her moniker while working for YMCO.

21. *Money Mules*. As of July 2013, YMCO had recruited over 15,000 U.S.-based Money Mules to effectuate the transfer of stolen money from the United States to Eastern Europe, including the following individuals:

a. C.M., who was during the relevant time period a resident of Las Cruces, New Mexico. C.M. accepted fake employment with a YMCO front company in or about October 2010 and held a bank account with Light Federal Credit Union.

b. D.E., who was during the relevant time period a resident of Durham, North Carolina. D.E. accepted fake employment with a YMCO front company in or about October 2010 and held a bank account with First Citizens Bank.

c. S.B., who was during the relevant time period a resident of Branson, Missouri. S.B. accepted fake employment with a YMCO front company in or about October 2010 and held a bank account with Regions Bank.

d. J.J., who was during the relevant time period a resident of Dallas, Texas. J.J. accepted fake employment with a YMCO front company in or about October 2010 and held a bank account with Bank of America.

e. C.C., who was during the relevant time period a resident of Gastonia, North Carolina. C.C. accepted fake employment with a YMCO front company in or about April 2013 and held a bank account with Wells Fargo.

f. R.H., who was during the relevant time period a resident of Charlotte, North Carolina. R.H. accepted fake employment with a YMCO front company in or about February 2013 and held a bank account with Wells Fargo.

g. P.F., who was during the relevant time period a resident of Hickory, North Carolina. P.F. accepted fake employment with a YMCO front company in or about May 2013 and held a bank account with Wells Fargo.

h. R.D., who was during the relevant time period a resident of Charlotte, North Carolina. R.D. accepted fake employment with a YMCO front company in or about May 2013 and held a bank account with Bank of America.

22. *Victims*. The Hackers compromised over 750 U.S. bank accounts, most of which belonged to U.S. companies. Once the victim bank accounts were compromised, the Hackers would use YMCO's services to move the money from the victim accounts to the Cash-Out Contractors outside the U.S. The Hackers generally gained access to these bank accounts by compromising computer systems, including the systems of the following victims:

a. Victim #1, located in Valdosta, Georgia, with an account at First State Bank and Trust.

b. Victim #2, located in Byron Center, Michigan, with an account at Chemical Bank.

c. Victim #3, located in Mooresville, North Carolina, with an account at Peoples Bank.

d. Victim #4, located in Wenonah, New Jersey, with an account at USAA Federal Savings Bank.

e. Victim #5.

f. Victim #6, located in St. Louis, with an account at First Citizens National Bank of Greater St. Louis.

23. *Money Transfer Companies*. YMCO used the following companies to transfer stolen funds overseas:

a. Western Union, a U.S.-based financial services company whose activities affect interstate and foreign commerce. Among other things, Western Union provided international money transfer services. The Western Union computer servers used to process the relevant electronic money transfers were located in the Western District of North Carolina. During the relevant time period, YMCO caused nearly 3,000 international money transfer wires of stolen funds to be sent through Western Union servers.

b. MoneyGram, a U.S.-based financial service company whose activities affect interstate and foreign commerce. Among other things, MoneyGram provided international money transfer services. During the relevant time period, YMCO caused approximately 1,700 international money transfer wires of stolen funds to be sent through MoneyGram servers.

24. *Financial Institutions*. YMCO and the Hackers compromised accounts maintained at over 35 banks. The activities of these banks, including Chemical Bank, First Citizens National Bank of Greater St. Louis, First State Bank and Trust, Peoples Bank, USAA Federal Savings Bank, and First National Bank of Omaha, affected interstate and foreign commerce.

## IV. Acts Committed in Furtherance of Illegal Conspiracy

25. YMCO, through the Defendants and others, committed and caused to be committed the following acts in furtherance of the fraudulent scheme, within the Western District of North Carolina and elsewhere:

### *MANAGING YMCO'S OPERATIONS*

26. On or about August 16, 2010, KORNIEV, using YMCO's internal communication forum, evaluated a YMCO employee's suggestions for improving operations.

27. On or about August 16, 2010, KORNIEV, using YMCO's internal communication forum, threatened to fire or cut the pay of YMCO employees unless they worked harder.

28. On or about September 6, 2010, KORNIEV, using YMCO's internal communication forum, fined two YMCO employees for making a mistake.

29. On or about August 25, 2010, KORNIEV, using YMCO's internal communication forum, informed YMCO employees that he planned to monitor their replies to Money Mules' questions, and, if the replies failed to directly address the Mules' questions, then the YMCO employee would be heavily fined.

30. On or about September 7, 2010, KORNIEV, using YMCO's internal communication forum, assigned certain countries to YMCO employees and ordered the employees to find ten job search websites for each country assigned to them.

31. On or about October 12, 2010, KORNIEV, using YMCO's internal communication forum, ordered YMCO employees to stop communicating through the internal communication forum so that there would not be an evidence trail for the FBI to follow.

32. On or about December 20, 2011, KORNIEV advised another YMCO employee that KORNIEV might fire numerous YMCO employees because they were not working hard enough.

33. On or about January 13, 2012, KORNIEV instructed a YMCO Programmer to contact another YMCO employee, at a number he provided, to deal with an issue.

34. On or about January 13, 2012, KORNIEV provided to a YMCO Programmer nine instant message accounts that he advised belonged to YMCO "support employees" and further advised that he would task these "support employees" to test an email system.

35. On or about February 9, 2012, KORNIEV instructed a YMCO Programmer to provide KORNIEV with a report of the number of emails that the Programmer was able to send from a specified list of spam email accounts.

36. On or about July 18, 2013, KORNIEV instructed a YMCO employee to purchase server space for YMCO's use.

37. On or about July 22, 2013, KORNIEV instructed a YMCO employee to create a new financial account to purchase services for YMCO's use.

38. On or about July 30, 2013, KORNIEV instructed a YMCO employee to replace servers that had stopped working.

39. On or about July 31, 2013, KORNIEV instructed a YMCO employee to provide an itemized accounting of services that the employee had previously purchased for YMCO's use.

*RECRUITING AND HANDLING MONEY MULES*

40. On or about and between July and August 2009, Chostak trained new YMCO Mule Recruiters and Handlers by pretending to be a Money Mule and sending them simulated email communications.

41. On or about September 1, 2010, Chostak, using YMCO's internal communication forum, suggested techniques that other YMCO Recruiters could use to increase the number of Mules recruited.

42. On or about December 20, 2010, Chostak directed YMCO Recruiters to create new email templates to recruit Money Mules.

43. On or about December 22, 2010, Rabutska, using YMCO's internal communication forum, posted a new email template for recruiting potential Money Mules.

*UPDATING FAKE FRONT COMPANY WEB SITES*

44. From on or about and between March 8, 2010 and October 18, 2010, Rabutska accepted assignments from YMCO to be the Mule Recruiter for approximately 18 fake front companies.

45. On or about September 6, 2010, Rabutska asked YMCO Programmers and Administrators to alter the fake front company websites to make it easier for Money Mules to register.

46. On or about October 8, 2010, Chostak, using YMCO's internal communication forum, directed other YMCO conspirators to search for potential new Money Mules in a legitimate commercial job web site.

*HIRING OF COCONSPIRATORS TO WORK FOR YMCO*

47. On or about July 27, 2009, Chostak offered Rabutska a job with YMCO as a Money Mule Recruiter.

48. On or about August 19, 2010, KORNIEV, using YMCO's internal communication forum, offered a bonus to any YMCO employee who could successfully recruit an individual who spoke Italian and English.

49. On or about September 2, 2010, Chostak, using YMCO's internal communication forum, stated that YMCO had need for bilingual employees.

50. On or about September 21, 2010, KORNIEV, using YMCO's internal communication forum, offered a bonus to any YMCO employee who could successfully recruit an individual proficient in JavaScript.

*REFINING SPAM EMAILS*

51. On or about November 9, 2009, Chostak tested a YMCO Mule recruitment spam email template by sending himself a spam email.

52. On or about September 3, 2010, Kharchenko added additional spam templates to the computer program linked to Money Mule recruitment.

*IMPROVING FUNCTIONALITY OF COMPUTER PROGRAMS AND SYSTEMS*

53. On or about September 3, 2009, Kharchenko uploaded the computer code for the spam email application to a digital library that tracked the modification to that code.

54. On or about April 21, 2010, Marchenko modified a YMCO computer program that updated files on servers hosting fake front company websites.

55. On or about July 15, 2010, Marchenko modified a YMCO computer program that was used to generate fake front company websites.

*TRANSFERRING AND RECEIVING STOLEN FUNDS THROUGH THE MOLDOVAN CASH-OUT CONTRACTORS*

56. On or about September 28, 2010, September 29, 2010, and October 9, 2010, another member of the Cash-Out Contractors sent messages to TOMUZ containing transaction

identification numbers and the corresponding transfer amounts, reflecting transfers of stolen funds.

57. On or about August 17, 2010, TOMUZ and another member of the Cash-Out Contractors discussed the use of a web application, which tracked the use of stolen Moldovan identities by YMCO, including the amount of stolen funds sent in the names of those identities.

58. On or about October 11, 18, and 25, 2010, TOMUZ and a YMCO principal discussed, via instant message, accounting for stolen funds sent to the Cash-Out Contractors by YMCO Money Mules, and the amount owed back to YMCO.

## *THEFT AND MONEY LAUNDERING OF VICTIM FUNDS*

### *First Theft of Funds from Victim #1*

59. On or about October 14, 2010, a YMCO Recruiter "hired" D.E. to work as a Money Mule for a fake front company that D.E. believed to be a legitimate company known as "Veni Group, Inc."

60. On or about October 18, 2010, the exact date being unknown, a Hacker believed to use the moniker "fuckthisworld" compromised Victim #1's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with First State Bank and Trust.

61. On or about October 18, 2010, Hacker "fuckthisworld" used YMCO software to select YMCO Money Mule D.E. to receive a fraudulent transfer of funds from Victim #1's account, and then transferred said funds to D.E. As part of this process, YMCO transferred D.E.'s personal information to the Hacker, including, but not limited to, D.E.'s full name, date of birth, bank account number, and routing number.

62. On or about October 18, 2010, Hacker "fuckthisworld" fraudulently transferred $8,532 from Victim #1's account to Money Mule D.E.'s account at First Citizens Bank.

63. On or about October 18, 2010, a YMCO Handler, using the alias "Karina Walter," instructed Money Mule D.E. to withdraw funds that had been transferred into D.E.'s bank account and transfer the funds overseas through Western Union to Moldova and Ukraine.

64. On or about October 18, 2010, in accordance with YMCO's tasking, Money Mule D.E. withdrew funds from D.E.'s bank account and used Western Union to send separate wires to the Cash-Out Contractors in Moldova and other conspirators in Ukraine. Specifically, D.E. wired $2,616 to "Ion Radenu" and $2,600 to "Rodica Mocanu," both in Moldova. TOMUZ possessed, on his personal computer, Western Union MCTNs associated with these transfers. D.E. also wired $2,632 to "Andriy Bedray" in Ukraine.

*Second Theft of Funds from Victim #1*

65. On or about October 13, 2010, a YMCO Recruiter "hired" S.B. to work as a Money Mule for a fake front company that S.B. believed to be a legitimate company known as "Idae Group, LLC."

66. On or about October 18, 2010, the exact date being unknown, a Hacker believed to use the moniker "fuckthisworld" compromised Victim #1's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with First State Bank and Trust.

67. On or about October 18, 2010, Hacker "fuckthisworld" used YMCO software to select YMCO Money Mule S.B. to receive a fraudulent transfer of funds from Victim #1's account, and then transferred said funds to S.B. As part of this process, YMCO transferred S.B.'s personal information to the Hacker, including, but not limited to, S.B.'s full name, date of birth, bank account number, and routing number.

68. On or about October 18, 2010, Hacker "fuckthisworld" fraudulently transferred $9,674 from Victim #1's account to Money Mule S.B.'s account at Regions Bank.

69. On or about October 18, 2010, a YMCO Handler, using the alias "Karina Parker," instructed Money Mule S.B. to withdraw funds that had been transferred into S.B.'s bank account and transfer the funds overseas through Western Union to Moldova.

70. On or about October 18, 2010, in accordance with YMCO's tasking, Money Mule S.B. withdrew funds from S.B.'s bank account and used Western Union to send separate wires to the Cash-Out Contractors in Moldova. Specifically, S.B. wired $2,964 to "Ludmila Munteanu" and $2,951 to "Svetlana Maksymyuk," both in Moldova. TOMUZ possessed, on his personal computer, Western Union MCTNs associated with these transfers.

*Third Theft of Funds from Victim #1*

71. On or about October 14, 2010, a YMCO Recruiter "hired" J.J. to work as a Money Mule for a fake front company that J.J. believed to be a legitimate company known as "Idae Group, LLC."

72. On or about October 18, 2010, the exact date being unknown, a Hacker believed to use the moniker "fuckthisworld" compromised Victim #1's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with First State Bank and Trust.

73. On or about October 18, 2010, Hacker "fuckthisworld" used YMCO software to select YMCO Money Mule J.J. to receive a fraudulent transfer of funds from Victim #1's account, and then transferred said funds to J.J. As part of this process, YMCO transferred J.J.'s personal information to the Hacker, including, but not limited to, J.J.'s full name, date of birth, bank account number, and routing number.

74. On or about October 18, 2010, Hacker "fuckthisworld" fraudulently transferred $8,758 from Victim #1's account to Money Mule J.J.'s account at Bank of America.

75. On or about October 18, 2010, a YMCO Handler, using the alias "Karina Parker," instructed Money Mule J.J. to withdraw funds that had been transferred into J.J.'s bank account and transfer the funds overseas through Western Union to Moldova and Ukraine.

76. On or about October 18, 2010, in accordance with YMCO's tasking, Money Mule J.J. withdrew funds from J.J.'s bank account and used Western Union to send separate wires to the Cash-Out Contractors in Moldova and other conspirators in Ukraine. Specifically, J.J. wired $2,685 to "Svetlana Petrov" and $2,600 to "Eugenia Guidea," both in Moldova. TOMUZ possessed, on his personal computer, Western Union MCTNs associated with these transfers. J.J. also wired $2,770 to "Uriy Lyashko" in Ukraine.

*Theft of Funds from Victim #2*

77. On or about October 13, 2010, a YMCO Recruiter "hired" C.M. to work as a Money Mule for a fake front company that C.M. believed to be a legitimate company known as "Vidi Group, Inc."

78. On or about October 20, 2010, the exact date being unknown, a Hacker believed to use the moniker "ibn" compromised Victim #2's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with Chemical Bank.

79. On or about October 21, 2010, Hacker "ibn" fraudulently transferred $4,950 from Victim #2's account to Money Mule C.M.'s account at Light Federal Credit Union.

80. On or about October 21, 2010, a YMCO Handler, using the alias "Suzan Whats," instructed Money Mule C.M. to withdraw funds that had been transferred into C.M.'s bank account and transfer the funds overseas through Western Union and MoneyGram to Moldova and Ukraine.

81. On or about October 21, 2010, in accordance with YMCO's tasking, Money Mule C.M. withdrew funds from C.M.'s bank account and used Western Union and MoneyGram

to send separate wires to the Cash-Out Contractors in Moldova and other conspirators in Ukraine. Specifically, C.M. wired $2,270 through Western Union to "Alexei Nudenenco" in Moldova. TOMUZ possessed, on his personal computer, a Western Union MCTN associated with this transfer. C.M. also wired $2,284 through MoneyGram to "Petro Karaykoza" in Ukraine.

*Theft of Funds from Victim #3*

82. On or about April 12, 2013, a YMCO Recruiter "hired" C.C. to work as a Money Mule for a fake front company that C.C. believed to be a legitimate company known as "Technical Resource Solutions, LLC."

83. On or about May 7, 2013, the exact date being unknown, a Hacker believed to use the moniker "land" compromised Victim #3's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with Peoples Bank.

84. On or about May 7, 2013, Hacker "land" used YMCO software to select YMCO Money Mule C.C. to receive a fraudulent transfer of funds from Victim #3's account, and then transferred said funds to C.C. As part of this process, YMCO transferred C.C.'s personal information to the Hacker, including, but not limited to, C.C.'s full name, date of birth, bank account number, and routing number.

85. On or about May 7, 2013, Hacker "land" fraudulently transferred $4,978 from Victim #3's account to Money Mule C.C.'s account at Wells Fargo.

86. On or about May 7, 2013, a YMCO Handler, using the alias "Sonya Scott," instructed Money Mule C.C. to withdraw funds that had been transferred into C.C.'s bank account and transfer the funds overseas through Western Union and MoneyGram to Ukraine.

87. On or about May 7, 2013, in accordance with YMCO's tasking, Money Mule C.C. withdrew funds from C.C.'s bank account and used Western Union and MoneyGram to send separate wires to conspirators and Ukraine. Specifically, C.C. wired $1,300 to "Dzhamila

Suleymanova" and $1,780 to "Vitaliy Yaremko," both in Ukraine, through MoneyGram. C.C. also wired $1,500 through Western Union to "Oleksandr Nechay" in Ukraine.

*Theft of Funds from Victim #4*

88. On or about May 1, 2013, a YMCO Recruiter "hired" R.D. to work as a Money Mule for a fake front company that R.D. believed to be a legitimate company known as "Freelance World LLC."

89. On or about May 14, 2013, the exact date being unknown, a Hacker believed to use the moniker "francis" used YMCO software to select YMCO Money Mule R.D. to receive a fraudulent transfer of funds from a victim's account with USAA Federal Savings Bank, and then arranged to have said funds transferred to R.D. As part of this process, YMCO transferred R.D.'s personal information to the Hacker, including, but not limited to, R.D.'s full name, date of birth, bank account number, and routing number.

90. On or about May 14, 2013, Hacker "francis" fraudulently transferred $4,795 from Victim #4's account to Money Mule R.D.'s account at Bank of America.

91. On or about May 14, 2013, a YMCO Handler, using the alias "Sonya Duncan," instructed Money Mule R.D. to withdraw funds that had been transferred into R.D.'s bank account and transfer the funds overseas through MoneyGram to Ukraine.

92. On or about May 14, 2013, in accordance with YMCO's tasking, Money Mule R.D. withdrew funds from R.D.'s bank account and used MoneyGram to send separate wires to conspirators in Ukraine. Specifically, R.D. wired $1,710 to "Lyudmyla Korol" and $1,300 to "Olena Shvachko," both in Ukraine, through MoneyGram.

*Theft of Funds from Victim #5*

93. On or about February 16, 2013, a YMCO Recruiter "hired" R.H. to work as a Money Mule for a fake front company that R.H. believed to be a legitimate company known as "Swift Transfer Group, Inc."

94. On or about February 20, 2013, the exact date being unknown, a Hacker believed to use the moniker "ultrahard" used YMCO software to select YMCO Money Mule R.H. to receive a fraudulent transfer of funds from a victim's bank account, and then transferred said funds to R.H. As part of this process, YMCO transferred R.H.'s personal information to the Hacker, including, but not limited to, R.H.'s full name, date of birth, bank account number, and routing number.

95. On or about February 20, 2013, Hacker "ultrahard" fraudulently transferred $3,000 from Victim #5's account to Money Mule R.H.'s account at Wells Fargo.

96. On or about February 20, 2013, a YMCO Handler, using the alias "Sonya Greyson," instructed Money Mule R.H. to withdraw funds that had been transferred into R.H.'s bank account and transfer the funds overseas through Western Union and MoneyGram to Ukraine.

97. On or about February 20, 2013, in accordance with YMCO's tasking, Money Mule R.H. withdrew funds from R.H.'s bank account and used Western Union and MoneyGram to send separate wires to conspirators and Ukraine. Specifically, R.H. wired $900 through Western Union to "Andriy Ryabou" in Ukraine. R.H. also wired $1,860 through MoneyGram to "Oleksandr Vorobyou" in Ukraine.

*Theft of Funds from Victim #6*

98. On or about May 9, 2013, a YMCO Recruiter "hired" P.F. to work as a Money Mule for a fake front company that P.F. believed to be a legitimate company known as "Consult-Compass Ltd."

99. On or about May 29, 2013, the exact date being unknown, a Hacker believed to use the moniker "Roach" compromised Victim #6's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with First Citizens National Bank of Greater St. Louis.

100. On or about May 29, 2013, the exact date being unknown, a Hacker believed to use the moniker "Roach" used YMCO software to select YMCO Money Mule P.F. to receive a fraudulent transfer of funds from Victim #6's bank account, and transferred said funds to P.F. As part of this process, YMCO transferred P.F.'s personal information to the Hacker, including, but not limited to, P.F.'s full name, date of birth, bank account number, and routing number.

101. On or about May 29, 2013, Hacker "Roach" fraudulently transferred $5,000 from Victim #6's account to Money Mule P.F.'s account at Wells Fargo.

102. On or about May 29, 2013, a YMCO Handler, using the alias "Sonya Hayes," instructed Money Mule P.F. to withdraw funds that had been transferred into P.F.'s bank account and transfer the funds overseas through Western Union and MoneyGram to Ukraine.

103. On or about May 29, 2013, in accordance with YMCO's tasking, Money Mule P.F. withdrew funds from P.F.'s bank account and used Western Union and MoneyGram to send separate wires to conspirators in Ukraine. Specifically, P.F. wired $1,500 through Western Union to "Lyudmyla Habrusenko" in Ukraine. P.F. also wired $1,700 to "Roman Lysenko" and $1,400 to "Anastasiya Shylenko," both in Ukraine, through MoneyGram.

## COUNT ONE
**(Conspiracy to Commit Money Laundering)**

104. Paragraphs 1 through 103 are realleged and incorporated by reference here.

105. Beginning in or about September 2007, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, the defendants, OLEG KORNIEV and SERGHEI IVANOVICH TOMUZ, did knowingly and intentionally conspire and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, to wit:

a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy to transport stolen property in violation of 18 U.S.C. § 371; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy to transport stolen property in violation of 18 U.S.C. § 371; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

c. to knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the withdrawal, deposit, and transfer of U.S. currency, funds, and monetary instruments, such property having been derived from specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy

to transport stolen property in violation of 18 U.S.C. § 371; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, all in violation of 18 U.S.C. § 1957(a).

## MANNER AND MEANS

106. The manner and means used to accomplish the objectives of the conspiracy included, among others, those described in Paragraphs 1 through 18.

## OVERT ACTS

107. In furtherance of the conspiracy, and to effect its objects and purposes, various overt acts were committed by the defendants and their conspirators known and unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, including but not limited to the acts described in Paragraphs 1 through 103.

All in violation of 18 U.S.C. § 1956(h).

## COUNTS TWO THROUGH EIGHTEEN
**(Money Laundering)**

108. Paragraphs 1 through 103 are realleged and incorporated by reference here.

109. On or about each of the dates below, within the Western District of North Carolina, and elsewhere, the defendants, OLEG KORNIEV and SERGHEI IVANOVICH TOMUZ, aiding and abetting each other and others known and unknown to the Grand Jury, attempted to and did transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, (a) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. §§ 371 and 1030(a)(4); (b) conspiracy to transport stolen property in violation of 18 U.S.C. §§ 371; (c) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (d) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (e) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, from a place in the United States, from within or through the Western District of North Carolina, to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of such unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, each instance identified below being a separate violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2:

| COUNT | APPROXIMATE DATE | DEFENDANT | MONETARY TRANSACTION |
|---|---|---|---|
| TWO | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,616 sent by Money Mule D.E. to the Cash-Out Contractors located in Moldova. |

| COUNT | APPROXIMATE DATE | DEFENDANT | MONETARY TRANSACTION |
|---|---|---|---|
| THREE | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,600 sent by Money Mule D.E. to the Cash-Out Contractors located in Moldova. |
| FOUR | October 18, 2010 | KORNIEV | International money transfer of $2,632 sent by Money Mule D.E. to conspirators located in Ukraine. |
| FIVE | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,964 sent by Money Mule S.B. to the Cash-Out Contractors located in Moldova. |
| SIX | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,951 sent by Money Mule S.B. to the Cash-Out Contractors located in Moldova. |
| SEVEN | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,685 sent by Money Mule J.J. to the Cash-Out Contractors located in Moldova. |
| EIGHT | October 18, 2010 | KORNIEV and TOMUZ | International money transfer of $2,600 sent by Money Mule J.J. to the Cash-Out Contractors located in Moldova. |
| NINE | October 18, 2010 | KORNIEV | International money transfer of $2,770 sent by Money Mule J.J. to conspirators located in Ukraine. |

| COUNT | APPROXIMATE DATE | DEFENDANT | MONETARY TRANSACTION |
|---|---|---|---|
| TEN | October 21, 2010 | KORNIEV and TOMUZ | International money transfer of $2,270 sent by Money Mule C.M. to the Cash-Out Contractors located in Moldova. |
| ELEVEN | February 20, 2013 | KORNIEV | International money transfer of $900 sent by Money Mule R.H. to conspirators located in Ukraine. |
| TWELVE | February 20, 2013 | KORNIEV | International money transfer of $1,860 sent by Money Mule R.H. to conspirators located in Ukraine. |
| THIRTEEN | May 7, 2013 | KORNIEV | International money transfer of $1,500 sent by Money Mule C.C. to conspirators located in Ukraine. |
| FOURTEEN | May 14, 2013 | KORNIEV | International money transfer of $1,710 sent by Money Mule R.D. to conspirators located in Ukraine. |
| FIFTEEN | May 14, 2013 | KORNIEV | International money transfer of $1,300 sent by Money Mule R.D. to conspirators located in Ukraine. |
| SIXTEEN | May 29, 2013 | KORNIEV | International money transfer of $1,500 sent by Money Mule P.F. to conspirators located in Ukraine. |
| SEVENTEEN | May 29, 2013 | KORNIEV | International money transfer of $1,700 sent by Money Mule P.F. to conspirators located in Ukraine. |

| COUNT | APPROXIMATE DATE | DEFENDANT | MONETARY TRANSACTION |
|---|---|---|---|
| EIGHTEEN | May 29, 2013 | KORNIEV | International money transfer of $1,400 sent by Money Mule P.F. to conspirators located in Ukraine. |

**COUNT NINETEEN**
**(Conspiracy to Commit Computer Fraud)**

110. Paragraphs 1 through 103 are realleged and incorporated by reference herein.

111. Beginning in or about September 2007, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, the defendant, OLEG KORNIEV, did knowingly and intentionally conspire and agree with others known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. § 1030, to wit: to knowingly, and with intent to defraud, access a protected computer without authorization, and by means of such conduct to further the intended fraud and obtain anything of value, the value of which exceeded $5,000 during a one-year period, in violation of 18 U.S.C. § 1030(a)(4).

**MANNER AND MEANS**

112. The manner and means used to accomplish the objectives of the conspiracy included, among others, those described in Paragraphs 1 through 18.

**OVERT ACTS**

113. In furtherance of the conspiracy, and to effect its objects and purposes, various overt acts were committed by the defendants and their co-conspirators known and unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, including but not limited to the acts described in Paragraphs 1 through 103.

All in violation of 18 U.S.C. § 371.

## COUNT TWENTY
**(Conspiracy to Transport Stolen Property and Receive Stolen Property)**

114. Paragraphs 1 through 103 are realleged and incorporated by reference herein.

115. Beginning in or about September 2007, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, the defendants, OLEG KORNIEV and SERGHEI IVANOVICH TOMUZ, did knowingly and intentionally conspire and agree with each other and others known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. §§ 2314 and 2315, to wit:

a. to transport, transmit, and transfer in interstate and foreign commerce United States money over $5,000, knowing the money to have been stolen and taken by fraud in violation of 18 U.S.C. § 2314; and

b. to receive, possess, conceal, and dispose of any money of the value of $5,000 or more, which has crossed a State and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken in violation of 18 U.S.C. § 2315.

## MANNER AND MEANS

116. The manner and means used to accomplish the objectives of the conspiracy included, among others, those described in Paragraphs 1 through 18.

## OVERT ACTS

117. In furtherance of the conspiracy, and to effect its objects and purposes, various overt acts were committed by the defendants and their conspirators known and unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, including but not limited to the acts described in Paragraphs 1 through 103.

All in violation of 18 U.S.C. § 371.

**COUNT TWENTY-ONE**
**(Conspiracy to Commit Access Device Fraud)**

118. Paragraphs 1 through 103 are realleged and incorporated by reference herein.

119. Beginning in or about September 2007, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, the defendant, OLEG KORNIEV, did knowingly and intentionally conspire and agree with others known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. § 1029, to wit: to knowingly and with intent to defraud, traffic in and use one or more unauthorized access devices during any one year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period, in violation of 18 U.S.C. § 1029(a)(2).

**MANNER AND MEANS**

120. The manner and means used to accomplish the objectives of the conspiracy included, among others, those described in Paragraphs 1 through 18.

**OVERT ACTS**

121. In furtherance of the conspiracy, and to effect its objects and purposes, various overt acts were committed by the defendants and their conspirators known and unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, including but not limited to the acts described in Paragraphs 1 through 103.

All in violation of 18 U.S.C. § 1029(b)(2).

**COUNTS TWENTY-TWO THROUGH TWENTY-FOUR**
**(Interstate and Foreign Transportation of Stolen Property)**

122. Paragraphs 1 through 103 are realleged and incorporated by reference herein.

123. On or about the dates below, within the Western District of North Carolina, and elsewhere, the defendant, OLEG KORNIEV, aiding and abetting others known and unknown to the Grand Jury, attempted to and did transport, transmit, and transfer in interstate and foreign commerce United States money over $5,000, knowing the money to have been stolen and taken by fraud in violation of 18 U.S.C. § 2314, each instance identified below being a separate violation of 18 U.S.C. §§ 2314 and 2:

| COUNT | APPROXIMATE DATE | TRANSPORTATION OF STOLEN MONEY |
|---|---|---|
| TWENTY-TWO | October 18, 2010 | International money transfers of approximately $7,848 of stolen money conducted by Money Mule D.E. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova and other conspirators in Ukraine. |
| TWENTY-THREE | October 18, 2010 | International money transfers of approximately $5,915 of stolen money conducted by Money Mule S.B. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova. |
| TWENTY-FOUR | October 18, 2010 | International money transfers of approximately $8,055 of stolen money conducted by Money Mule J.J. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova and other conspirators in Ukraine. |

## COUNTS TWENTY-FIVE THROUGH TWENTY-SEVEN
**(Interstate and Foreign Receipt of Stolen Property)**

124. Paragraphs 1 through 103 are realleged and incorporated by reference herein.

125. On or about the dates below, within the Western District of North Carolina, and elsewhere, the defendant, SERGHEI IVANOVICH TOMUZ, aiding and abetting others known and unknown to the Grand Jury, attempted to and did receive, possess, conceal, and dispose of any money of the value of $5,000 or more, which has crossed a State and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken in violation of 18 U.S.C. § 2315, each instance identified below being a separate violation of 18 U.S.C. §§ 2315 and 2:

| COUNT | APPROXIMATE DATE | RECEIPT OF STOLEN MONEY |
|---|---|---|
| TWENTY-FIVE | October 18, 2010 | International money transfers of approximately $5,216 of stolen money conducted by Money Mule D.E. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova. |
| TWENTY-SIX | October 18, 2010 | International money transfers of approximately $5,915 of stolen money conducted by Money Mule S.B. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova. |
| TWENTY-SEVEN | October 18, 2010 | International money transfers of approximately $5,285 of stolen money conducted by Money Mule J.J. through Western Union servers located in the Western District of North Carolina to the Cash-Out Contractors located in Moldova. |

## COUNTS TWENTY-EIGHT THROUGH THIRTY-FIVE
**(Aggravated Identity Theft)**

126. Paragraphs 1 through 103 are realleged and incorporated by reference here.

127. On or about each of the dates below, within the Western District of North Carolina, and elsewhere, the defendant, OLEG KORNIEV, aiding and abetting others known and unknown to the Grand Jury, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, the full name, date of birth, bank account number, and routing number of each Money Mule listed below, during and in relation to the offenses charged in Count Nineteen (Conspiracy to Commit Computer Fraud) and Count Twenty-One (Conspiracy to Commit Access Device Fraud), knowing that the means of identification belonged to an actual person, each instance identified below being a separate violation of 18 U.S.C. §§ 1028A(a)(1) and 2:

| COUNT | APPROXIMATE DATE | MONEY MULE |
|---|---|---|
| TWENTY-EIGHT | October 18, 2010 | D.E |
| TWENTY-NINE | October 18, 2010 | S.B. |
| THIRTY | October 18, 2010 | J.J. |
| THIRTY-ONE | October 20, 2010 | C.M. |
| THIRTY-TWO | February 20, 2013 | R.H. |
| THIRTY-THREE | May 7, 2013 | C.C. |
| THIRTY-FOUR | May 14, 2013 | R.D. |
| THIRTY-FIVE | May 29, 2013 | P.F. |

## NOTICE OF FORFEITURE

128. Paragraphs 1 through 103 are realleged and incorporated by reference here for the purpose of alleging forfeiture, pursuant to 18 U.S.C. §§ 981, 982, and 1030; 21 U.S.C. § 853; and 28 U.S.C. § 2461.

129. Pursuant to Federal Rule of Criminal Procedure 32.2(a), the United States gives notice to each defendant that, in the event of a conviction of any of the offenses charged in this Indictment, the United States intends to forfeit property as further described in this notice.

130. If a defendant is convicted of conspiracy to commit fraud in connection with computers, in violation of 18 U.S.C. §§ 371 and 1030, then the following property shall be subject to forfeiture: any personal property that was used or intended to be used to commit or to facilitate the commission of such violation, and any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, pursuant to 18 U.S.C. §§ 1030(i)(1) and (j); any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of such violation, pursuant to 18 U.S.C. § 982(a)(2)(B), and any property, real or personal, which constitutes or is derived from proceeds traceable to the violation, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

131. If a defendant is convicted of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2), then the following property shall be subject to forfeiture: any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation, pursuant to 18 U.S.C. § 982(a)(2)(B), and any property, real or personal, which constitutes or is derived from proceeds traceable to the violation of § 1029, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

132. If a defendant is convicted of conspiracy to transport stolen property, in violation of 18 U.S.C. § 371; interstate transportation of stolen property, in violation of 18 U.S.C. § 2314; or interstate receipt of stolen property, in violation of 18 U.S.C. § 2315, then the following property shall be subject to forfeiture: any property, real or personal, which constitutes or is derived from proceeds traceable to the violation, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

133. If a defendant is convicted of conspiracy to commit money laundering or money laundering, in violation of 18 U.S.C. § 1956, then the following property shall be subject to forfeiture: any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1); and any property, real or personal, involved in a transaction or attempted transaction in violation of § 1956, or any property traceable to such property, pursuant to 18 U.S.C. § 981(a)(1)(A) and 28 U.S.C. § 2461(c).

134. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to and intends to seek forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

121. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment in the amount of approximately $10 million, such amount constituting the proceeds of the violations set forth in this bill of indictment

All pursuant to 18 U.S.C. §§ 981, 982, and 1030; 21 U.S.C. § 853; and 28 U.S.C. § 2461.

A TRUE BILL

[redacted]

DATE: Feb. 21, 2017

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

KEVIN ZOLOT
Assistant United States Attorney

RYAN K. DICKEY
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Computer Crime and Intellectual Property Section