IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 3:17-CR-45-MOC |
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| (1) OLEG KORNIEV | ) | |
| | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter. References to the United States herein shall mean the United States Attorney for the Western District of North Carolina and the Computer Crime and Intellectual Property Section ("CCIPS") of the United States Department of Justice.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

1. From in or about September 2007 and continuing until in or about July 2014, an international money laundering organization, named Your Mule Cashout ("YMCO") by law enforcement, offered its money mule services to international cybercriminals ("Hackers"). Money mules are individuals who transfer illegally acquired money on behalf of others. Defendant OLEG KORNIEV was a principal of YMCO and a member during its existence. YMCO was responsible for over $14.7 million in actual and intended losses by confirmed victims. During the period from in or about August 2009 to in or about July 2014, KORNIEV and YMCO intended to launder over $9.7 million and actually did launder at least $7 million of stolen money from the United States to overseas countries.

2. KORNIEV and others worked for YMCO from Ukraine and other places outside the United States. They created, maintained, and operated a sophisticated online infrastructure that

allowed Hackers, who had stolen money primarily from United States victims' bank accounts, to conceal, transfer, and obtain the stolen money in countries outside of the United States. With the assistance of YMCO money mules ("Money Mules"), YMCO members and other Hackers electronically transferred millions in stolen money from U.S.-based compromised bank accounts to foreign countries, including Moldova, Ukraine, Russia, and Latvia.

3. YMCO's services operated through an online infrastructure that allowed Hackers to transfer stolen money out of the United States, primarily to Eastern Europe, in exchange for a percentage of the money stolen. YMCO marketed its services to these Hackers in underground chat forums. These Hackers used various computer malware programs to infect the computers of United States victims. The malware programs enabled the Hackers to access the victims' bank accounts and then steal money from those accounts through the services of YMCO.

4. YMCO provided these services to the Hackers through the use of Money Mules. Money Mules were U.S. residents whom YMCO deceived into believing that they were working for legitimate companies and conducting legitimate money transfers for those companies. Through sophisticated computer programming, YMCO created seemingly legitimate websites for fake companies. YMCO members used these websites to recruit and employ Money Mules to conduct YMCO money laundering services. The websites, as well as the YMCO computer infrastructure, were created by computer programmers ("Programmers") and maintained by website administrators ("Administrators").

5. After the creation of websites for the fake companies, YMCO recruiters ("Recruiters") sent spam emails to potential Money Mules advertising employment opportunities. When a potential Money Mule responded to the spam, YMCO put the applicants through what appeared to be a legitimate hiring process, including an application, employment test, employment agreement, registration with the company's website, review of company policies, and assignment of a supervisor ("Handler"). YMCO Handlers were responsible for communicating directly with the Mules and assigning them money processing jobs. Handlers communicated with the Money Mules by email, telephone, and through a messaging platform built into the website of the fake company. Within YMCO, Recruiters and Handlers were supervised by managers ("Managers"), who reported directly to the YMCO principals, including KORNIEV. As of July 2013, YMCO had recruited over 15,000 U.S.-based Money Mules to effectuate the transfer of stolen money from the United States to Eastern Europe

6. As a condition of employment, YMCO required that each Money Mule have a U.S.-based bank account and to provide the organization with their account information, including bank account and routing numbers, using a website associated with the fake company. YMCO informed the new Money Mules that they would be working from home, processing payments for legitimate transactions. Specifically, YMCO falsely represented that the Mules' job was to receive payments from businesses into their personal bank accounts, withdraw the money, and then wire the funds to the fake company's partners overseas. In reality, the Money Mules processed the Hackers' stolen proceeds and wired them out of the country to other YMCO conspirators. Once YMCO obtained the Money Mules' account information, the organization made that information

available to the Hackers through an online portal. After a Hacker compromised a bank account, the Hacker used the YMCO platform to access the account information for a Money Mule. The Hacker then sent the stolen money to the Mules' bank accounts.

7. At or around the time the Hackers wired money from the compromised account, a Handler emailed the relevant Money Mule alerting him that he had a new task. This caused the Mule to then log into the fake company website, where a message awaited. This message instructed the Mule to withdraw the newly deposited funds from his account, take the funds to a money services company, and transfer the funds overseas. In most instances, YMCO directed the funds be wired through Western Union or MoneyGram to Eastern Europe, usually to Moldova, Ukraine, Russia, or Latvia. YMCO and the Hackers used each Money Mule only once and never paid the promised salary. Sometimes the Money Mules lost money on the transaction because of associated banking and transmitting fees.

8. YMCO contracted with individuals ("Cash-Out Contractors") in the foreign countries to retrieve the wired money. The Cash-Out Contractors—operating out of various foreign countries—accepted transfers from YMCO's U.S.-based Money Mules, took a percentage of the money transferred, and then delivered the remaining money to YMCO. In Moldova, a conspirator provided the Cash-Out Contractors with the stolen personal information of adult Moldovan students. The Cash-Out Contractors provided these misappropriated identities to YMCO, who then provided them to Money Mules. The Mules then sent the funds by Western Union or MoneyGram to the Cash-Out Contractors in Moldova under the names of the stolen Moldovan identities. Subsequently, YMCO provided the Cash-Out Contractors with the unique transfer tracking number, associated (stolen) name, and transfer amount.

9. Members of the Cash-Out Contractors then provided the stolen names and unique transfer tracking numbers to bank tellers in Moldova who worked for the Cash-Out Contractors. The tellers surreptitiously accepted and held the funds, and then provided the funds to the Cash-Out Contractors. The Cash-Out Contractors then took a percentage of the funds for their fee before transferring the remaining proceeds to YMCO. Although YMCO was the Moldovan Cash-Out Contractors' largest customer, the Moldovan Cash-Out Contractors provided the same service to other cybercriminal organizations.

10. In addition to the United States, YMCO operated similar money laundering schemes in Germany, Italy, United Kingdom, and Australia, among other places.

11. The defendant, OLEG KORNIEV, was a dual Ukrainian and Russian citizen who was a resident of Ukraine. KORNIEV was a principal of YMCO and a member from at least August 2009 and continuing until in or about July 2014. As a principal, KORNIEV developed YMCO's policies and procedures; managed, hired, and fired employees; rewarded and punished employees based on performance; and secured illegal services supporting YMCO. To hide his true identity, KORNIEV used the monikers "FairPlay," "FP," "Ocean," and "Gold" while working for YMCO.

12. The Hackers compromised over 750 U.S. bank accounts, most of which belonged to U.S. companies. Once the victim bank accounts were compromised, the Hackers would use YMCO's services to move the money from the victim accounts to the Cash-Out Contractors outside the U.S. The Hackers generally gained access to these bank accounts by compromising computer systems. Based on these facts, KORNIEV admits that he committed the violations of U.S. law outlined below.

13. First, KORNIEV conspired to conduct money laundering, in violation of 18 U.S.C. § 1956(h). Beginning in or about August 2009, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, KORNIEV knowingly and intentionally conspired and agreed with others to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, namely:

a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy to transport stolen property in violation of 18 U.S.C. §§ 371 and 2314; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy to transport stolen property in violation of 18 U.S.C. §§ 371 and 2314; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

c. to knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the withdrawal, deposit, and transfer of U.S. currency, funds, and monetary instruments, such property having been derived from specified unlawful activity, that is, (i) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. § 371 and 1030(a)(4); (ii) conspiracy to transport stolen property in violation of 18 U.S.C. §§ 371 and 2314; (iii) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (iv) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (v) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, all in violation of 18 U.S.C. § 1957(a).

14. KORNIEV knowingly and willfully joined this conspiracy with the intent to further its criminal objectives and purposes.

15. Second, KORNIEV aided and abetted money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2. On or about May 29, 2013, in the Western District of North Carolina and elsewhere, KORNIEV knowingly and intentionally aided and abetted others to transport, transmit, or transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, (a) conspiracy to commit fraud in relation to computers in violation of 18 U.S.C. §§ 371 and 1030(a)(4); (b) conspiracy to transport stolen property in violation of 18 U.S.C. §§ 371 and 2314; (c) conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2); (d) interstate transportation of stolen property in violation of 18 U.S.C. § 2314; and (e) interstate and foreign receipt of stolen property in violation of 18 U.S.C. § 2315, from a place in the United States, from within or through the Western District of North Carolina, to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represented the proceeds of such unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2, namely, an international money transfer of $1,700 sent by Money Mule P.F. to the Cash-Out Contractors located in Ukraine, which is described in more detail below.

16. Third, KORNIEV conspired to commit computer fraud, in violation of 18 U.S.C. § 371 and 1030(a)(4). Beginning in or about August 2009, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, KORNIEV knowingly and intentionally conspired and agreed with others to commit offenses against the United States in violation of 18 U.S.C. § 1030, namely, by knowingly and with intent to defraud accessing a protected computer without authorization, and by means of such conduct furthering the intended fraud and obtaining one or more things the value of which exceeded $5,000 during a one-year period, in violation of 18 U.S.C. §§ 371 and 1030(a)(4). KORNIEV knowingly and willfully joined this conspiracy with the intent to further its criminal objectives and purposes. This conduct involved the unauthorized access to victim bank accounts by the Hackers and the theft of funds

from those victims. An example of an overt act for purposes of carrying out the conspiracy was the stealing of money from a victim's bank account by a Hacker known as "Roach," which is described in more detail below.

17. Fourth, KORNIEV conspired to commit access device fraud, in violation of 18 U.S.C. §§ 1029(b)(2) and (a)(2). Beginning in or about August 2009, and continuing to at least in or about July 2014, in the Western District of North Carolina and elsewhere, KORNIEV knowingly and intentionally conspired and agreed with others to commit offenses against the United States in violation of 18 U.S.C. § 1029, namely, by knowingly and with intent to defraud trafficking in or using one or more unauthorized access devices during any one-year period, and by such conduct obtaining one or more things of value aggregating $1,000 or more during that period, in violation of 18 U.S.C. §§ 1029(b)(2) and (a)(2). KORNIEV knowingly and willfully joined this conspiracy with the intent to further its criminal objectives and purposes. This conduct involved the trafficking of bank account and routing numbers of Money Mule bank accounts for the purpose of facilitating computer fraud and money laundering. Money Mules were defrauded into providing their bank account information to YMCO. An example of an overt act for the purposes of carrying out the conspiracy was the fraudulent use of Money Mule P.F.'s bank account number, which is described in more detail below.

18. Fifth, KORNIEV aided and abetted aggravated identity theft. On or about May 29, 2013, in the Western District of North Carolina, and elsewhere, KORNIEV knowingly and intentionally aided and abetted others in knowingly transferring, possessing, or using, without lawful authority, a means of identification of another person, namely, the full name, date of birth, bank account number, and routing number of P.F. during and in relation to the offenses of (i) conspiracy to commit computer fraud and (ii) conspiracy to commit access device fraud, knowing that the means of identification belonged to an actual person, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.

19. P.F. was resident of Hickory, North Carolina. On or about May 9, 2013, a YMCO Recruiter "hired" P.F. to work as a Money Mule for a fake front company that P.F. believed to be a legitimate company known as "Consult-Compass Ltd." In connection with the fake job offer, YMCO defrauded P.F. into providing his or her bank account number and routing number for his or her bank account. YMCO then made P.F. available as a Money Mule to Hackers through the YMCO online portal. On or about May 29, 2013, the exact date being unknown, a Hacker believed to use the moniker "Roach" compromised a victim's computer system, thereby giving the Hacker unauthorized access to the victim's online bank account with a Missouri-based bank. On or about May 29, 2013, the exact date being unknown, Roach used YMCO software to select YMCO Money Mule P.F. to receive a fraudulent transfer of funds from the victim bank account, and transferred said funds to P.F.'s account. As part of this process, YMCO transferred P.F.'s personal information to the Hacker, including, but not limited to, P.F.'s full name, date of birth, bank account number, and routing number. Roach fraudulently transferred $5,000 from the victim account to Money Mule P.F.'s account. The same day, a YMCO Handler using the alias "Sonya Hayes," instructed P.F. to withdraw funds that had been transferred into P.F.'s bank account and transfer the funds overseas through Western Union and MoneyGram to Ukraine. On or about May

29, 2013, in accordance with YMCO's tasking, P.F. withdrew funds from P.F.'s bank account and used Western Union and MoneyGram to send separate wires to conspirators in Ukraine. Specifically, P.F. wired $1,500 through Western Union to "L. H." in Ukraine. P.F. also wired $1,700 to "R. L." and $1,400 to "A. S.," both in Ukraine, through MoneyGram.

20. YMCO was responsible for at least $14,776,963 in actual and intended losses by confirmed victims, which were losses known to or reasonably foreseeable by KORNIEV. During the period from in or about August 2009 to in or about July 2014, KORNIEV and YMCO actually laundered at least $7,003,003 in stolen funds and intended to launder at least another $2,744,374 in stolen funds, for a total of $9,747,377. The parties agree that the total loss amount is $14,776,963. Thus, the actual or intended loss attributable to KORNIEV is greater than $9,500,000, but less than $25,000,000.

21. The offenses involved 10 or more victims.

22. The offenses involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and a substantial part of the fraudulent scheme was committed from outside the United States.

23. The offenses involved the trafficking of unauthorized access devices.

24. The defendant was in the business of laundering funds.

25. The offenses involved sophisticated laundering.

26. The defendant was a manager or supervisor (but not an organizer or leader), and the criminal activity involved five or more participants or was otherwise extensive.

RUSS FERGUSON
UNITED STATES ATTORNEY

MATTHEW WARREN
ASSISTANT UNITED STATES ATTORNEY

MATTHEW A. LAMBERTI
SENIOR COUNSEL
COMPUTER CRIME AND INTELLECTUAL PROPERTY SECTION
U.S. DEPARTMENT OF JUSTICE

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis and the Bill of Indictment in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis and the Bill of Indictment. I hereby certify that the defendant does not dispute this Factual Basis.

______________________________ DATED: Sep. 10 ,2026

Arkady Bukh, Attorney for Defendant